**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DESHARD WRIGHT,**

                            **Petitioner,**                    **9:02-cv-508**
                                                               **(GLS/VEB)**

            **v.**

**GEORGE DUNCAN,** Superintendent,
Shawangunk Correctional Facility,

                            **Respondent.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PETITIONER:**
Deshard Wright
Pro Se
96-B-2470
Shawangunk Correctional Facility
P.O. Box 700
Shawangunk, NY 12589

**FOR THE RESPONDENT:**
HON. ERIC T. SCHNEIDERMAN          THOMAS B. LITSKY
New York State Attorney General    Assistant Attorney General
120 Broadway
New York, NY 10271

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

In an amended habeas corpus petition filed pursuant to 28 U.S.C. § 2254, petitioner Deshard Wright challenges his New York State convictions for second-degree murder, second-degree attempted murder, and second-degree criminal possession of a weapon. (*See* Am. Pet., Dkt. No. 6.) His petition was eventually referred to Magistrate Judge Victor E. Bianchini for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (*See* Reassignment Order, Dkt. No. 24.) After the respondent answered, (*see* Answer, Dkt. Nos. 10, 11), and Wright filed a traverse, (*see* Dkt. No. 17), Judge Bianchini issued a report and recommendation (R&R) in which he recommended that the petition be conditionally granted on due process grounds, (*see* 1st R&R, Dkt. No. 26). In his objections, respondent George Duncan advanced new arguments in opposition to Judge Bianchini's due process conclusions. (*See* Resp't Objections, Dkt. No. 29.) Given the new arguments, and at Judge Bianchini's request, the court again referred the case for a supplemental R&R. (*See* Mar. 18, 2008 Order, Dkt. No. 30.) In his supplemental R&R, Judge Bianchini reaffirmed his earlier recommendation, and further

2

recommended that the court disregard respondent's new arguments. (*See* 2d R&R, Dkt. No. 31.)[1]  Pending are respondent's renewed objections.  (*See* Objections, Dkt. Nos. 29, 34.)  Wright filed no objections.

For the following reasons, the court:  (1) upon de novo review, declines to adopt Judge Bianchini's recommendation to disregard respondent's new arguments; (2) upon de novo review, rejects Judge Bianchini's recommendation that Wright's petition be conditionally granted on his due process claim; (3) upon clear error review, adopts Judge Bianchini's recommendation dismissing Wright's remaining claims; (4) dismisses Wright's petition; and (5) grants a limited certificate of appealability.

## II. Standard of Review

The court has previously recited the authority afforded both by statute and rule to refer habeas corpus petitions to magistrate judges, and the standards of review this court employs when evaluating all report and recommendation orders.  *See Almonte v. N.Y. State Div. of Parole*, No. 04-cv-484, 2006 WL 149049, at *2-3 (N.D.N.Y. Jan. 18, 2006).  Succinctly

---

[1]The Clerk is directed to append Judge Bianchini's two R&Rs to this decision, and familiarity therewith is presumed.

stated, a party who fails to timely or specifically object to a magistrate judge's conclusions, procedurally defaults and forfeits his right to judicial review.  *See id.* at *3.  While procedural default alone is sufficient to warrant adoption of a magistrate's conclusions, the court retains the discretion to excuse the default in the interests of justice.  *See id.* at *4. When timely and specific objections are made to the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo.  De novo review requires the court to give fresh consideration to preserved objections, examine the entire record, and make an independent assessment of the magistrate's factual and legal conclusions.  *See id.* at *5.  Otherwise, and if the court elects to excuse defaults, it limits its review to clear error.  "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights."  *Id.* at *6.

### III.  **Background**

Because it views the underlying record somewhat differently than does Judge Bianchini, the following reflects the court's de novo reconstruction of the record.

On November 2, 1995, events that began with an argument, a fist

4

fight, and a stolen bicycle culminated with nineteen-year-old Robert Crouse being shot and killed on Mary Street in Utica, New York.  The details of those events, the subsequent investigation, and two ensuing trials reflect the difficulties this court has often seen when criminal charges, warring factions, and neighborhood disputes collide.  In the end, a jury concluded that Deshard Wright murdered Crouse, attempted to murder Crouse's companion, and illegally possessed a loaded handgun. Having failed to persuade New York's trial and appellate courts that his trial was unfair, Wright now seeks federal habeas relief.

In the early evening of November 2, Crouse, a Caucasian male, rode his bicycle to visit friends at a residence located a few doors down from 513 Mary Street, the home of Barbara Thompson.  (Tr. at 22, 45-47, 481, 496.)[2]  As Crouse was leaving, an argument ensued with three African-American individuals present at the Thompson residence—Wright, Alex Thompson, and Jamie Thompson—who accused Crouse of disrespecting their neighborhood by breaking a glass bottle on the sidewalk.  (Tr. at 382-85, 396, 421-22, 427.)  A fight ensued between

_____

[2]"Tr." refers to the five volume murder trial transcript that is consecutively paginated.

Crouse, the three men, and other neighborhood companions, whereby Crouse was beaten and his bicycle was stolen.  (Tr. at 22, 45-47, 382-85, 396.)[3]  Twelve-year-old Brent Mowery was a friend of Wright and the Thompsons, and participated in the fight.  (Tr. at 29-30, 462, 494.)  After the fight, Crouse left the neighborhood.  (Tr. at 45-46.)

A few hours later, Crouse returned with his father, Gabriel Ingrassia, and others to look for his bicycle.  (Tr. at 47, 195.)  After a verbal confrontation again ensued between Wright, the Thompsons, and Crouse, the police were called, the combatants were dispersed, and Crouse left with his father.  (Tr. at 50-53, 90-96, 197-98, 385-87.)  During the confrontation, either Wright or one of the Thompsons told Crouse, "we don't fight with our hands; we fight with our finger on the trigger."  (Tr. at 196.)

At around 11:30 p.m., Crouse again returned, this time in a car accompanied by three teenaged friends—Ingrassia, Ciro Raspante, and Joseph Donatello.  (Tr. at 23, 27, 197-200, 387-88.)  Raspante was

_____

[3]As a result of this earlier encounter, Wright and the Thompsons were indicted for robbery, assault, and larceny.  (*See* Indictment No. 95-483.)  Before the murder trial began, that indictment was tried to a verdict from April 29 to May 16, 1996.  (*See* Assault & Robbery Trial (ART) Tr., Vols. I-VIII.)

driving, Ingrassia was in the front passenger's seat, and Crouse and Donatello were in the rear.  (Tr. at 199, 276.)  While the others remained in the vehicle, Crouse exited the vehicle and once again confronted the Thompsons and Wright as they walked up Mary Street.  (Tr. at 23-24, 201-08, 387-399.)  As the argument continued and Crouse and Alex Thompson squared off in fighters' stances, Wright stepped forward, told Crouse to "back the f*** up and get the f*** out of my face," pulled a handgun from his waist and shot at Crouse five to six times, hitting him twice.  (Tr. at 25-26, 177-78, 189, 207-10, 212-14, 284-85, 336-339, 395-400, 501.)  Wright then pointed the gun at Ingrassia's head while Ingrassia was seated in the front passenger seat, fired, and the bullet deflected off of the windshield.  (Tr. at 26, 150-51, 214-15, 341, 345-46.)  Wright and the Thompsons then fled, and the friends drove Crouse to the hospital where he was pronounced dead on arrival.  (Tr. at 366-70.)

When the fatal confrontation first began, Mowery heard the commotion, came out of his house, followed the entire entourage up Mary street, and watched Wright pull the handgun and shoot.  (Tr. at 452-514.)

Jamie Thompson was young, five-feet eight-inches tall, and thin. Alex Thompson, Jamie's uncle, was older, five-feet six-inches tall, and

stocky.  Deshard Wright was young, thin, and, at six-feet one-inch tall, the tallest of the three.  (Tr. at 24, 36, 90-92.)

Once the hospital notified the police of the homicide, responding officers immediately took Raspante, Ingrassia, and Donatello to the police station to begin their investigation.  (Tr. at 289, 342.)

Raspante was seventeen years old and the driver of the car.  (Tr. at 327-28.)  Having seen the protagonists through the front windshield, he described them as short and stocky (Alex Thompson), taller (Jamie Thompson), and tallest (Wright).  (Tr. at 333.)  Raspante looked at a photo array and did not identify any of the three as the shooter.  (Tr. at 349, 351-52.)  He did, however, identify the tallest (Wright) as the shooter, but said the shooter was wearing a black knit hat.  (*Id.*)

Eighteen-year-old Ingrassia was in the front passenger's seat, approximately five to seven feet from the shooter when shots were fired, and, from a photographic array, identified Wright as the shooter.  (Tr. at 193, 217, 232, 259.)   He also identified Wright at trial, and testified that Wright was the tallest of the three.  (*Id.*)

Fourteen-year-old Donatello was seated in the rear seat, and knew Jamie Thompson from school.  (Tr. at 27-28, 273, 276.)  After he was in

8

the police station all night and before he left the following morning, he told the police that Jamie Thompson was the shooter, picked his photograph from the array, and stated that the shooter was wearing a black knit hat. (Tr. at 289-90, 295-96, 298-300, 302.)  Donatello thereafter left the police station, but later returned and told the police that he had thought about his identification, and that he was wrong because the shooter was not the medium-sized protagonist (Jamie Thompson) but instead the tallest of the three (Wright).  (Tr. at 292-93.)  When he first talked to the police, he told them that the shooter was wearing a black knit hat, but otherwise his physical description matched Wright.  (Tr. at 295-96, 324.)

Immediately after the shooting, Wright and the Thompsons ran to the residence of Allena Rivera.  (Tr. at 404.)  Rivera was Alex Thompson's sister and Jamie Thompson's mother, and owned the home where Wright, a New York City transplant, was staying.  (Tr. at 36, 404, 494, 629-77.) Upon arriving, Alex changed his clothes and left.  (Tr. at 404.)

Late the following morning, Utica police officer Michael Acquaviva went to the residence and observed Jamie Thompson coming from a bedroom and Wright sitting on a couch.  (Tr. at 634.)  After taking Wright and Jamie Thompson to the police station, Acquaviva returned to the

house and seized Crouse's bicycle, a black knit hat from the bedroom, and a do-rag from the couch.  (Tr. at 634-35, 639, 641-43.)  Acquaviva then returned to the station and interviewed Wright.  (Tr. at 647-649, 656-658; *see also* Dec. 22, 1995 § 710.30 Notice & Wright Statement; Dec. 19, 2005 Arraignment Mins.)[4]  Although Wright did not explicitly identify the shooter, he implied that Jamie Thompson shot Crouse.  (*See* Dec. 22, 1995 § 710.30 Notice & Wright Statement.)

Based upon Donatello's initial identification, Jamie Thompson was charged by felony complaint with robbing and assaulting Crouse earlier in the evening and with Crouse's later murder.  (*See, e.g.*, Resp't Objections, Dkt. No. 34.)  However, Donatello later recanted and identified Wright as the shooter, whereby Thompson was released from jail on bail and the murder investigation focused on Wright.  (*See id.*)[5]  Within a few days,

_____

[4]These and other documents constitute unnumbered contents of the non-electronic file.

[5]The court realizes that this explanation of events is contained in the respondent's objections and is not concisely stated in the underlying record.  However, the explanation is amply corroborated by the ensuing record events.  The court makes this observation because Judge Bianchini found circumstantial support for his "wrong man" hypothesis in the district attorney's decision to initially charge Jamie Thompson coupled with his circumstantial conclusion that the charges remained pending because the prosecution was uncertain about identity.  The current

10

Wright was arrested and charged by felony complaint with Crouse's murder.  (*See id.*)

On December 15 and 20, 1995, a grand jury returned separate indictments, Nos. 95-483 and 95-492.  (*See* Feb. 5, 1996 Deep Notice of Appearance, Disc. Demand, & Omnibus Mot.)  Indictment No. 95-483 charged Wright and both Thompsons with, among other things, robbery and assault based on the earlier November 2 events.  (*See* Indictment No. 95:483; *see also* Dec. 19, 1995 Arraignment Mins.)  Indictment No. 95-492 charged Wright with Crouse's murder, attempted murder of Ingrassia, and possession of a handgun.  (*See* Feb. 5, 1996 Deep Notice of Appearance, Disc. Demand, & Omnibus Mot.)  Wright was represented on both indictments by Norman Deep, Esq.  (*Id.*)  Jamie Thompson was not indicted for murder.

Between April 29 and May 16, 1996, Wright and the Thompsons were tried on the robbery and assault indictment.  (*See* ART Tr., Vols. I-VIII.)  Jamie Thompson was represented by Frank Nebush, Alex Thompson by Rebecca Wittman, and Wright by Deep.  (*See id.*, Vol. I at 1-2.)  At trial, neither Jamie Thompson nor Wright testified; but Alex

_____

explanation diminishes that conclusion.

Thompson did testify regarding the earlier November 2 events.  (*See id.* at 1300-52.)  At the conclusion of the trial, the jury convicted Wright and Jamie Thompson of misdemeanor assault and larceny, and Alex Thompson of felonious assault.  (*See id.* at 1557-65.)  On June 26, 1996, Wright was sentenced to two-years imprisonment to be served in the Oneida County Jail.  (*See* June 26, 1996 Sentencing Mins.)

Wright's murder trial did not begin until September 1996.  (Tr. at 2.) In pretrial motions, Wright sought to suppress identification testimony. (*See* Feb. 5, 1996 Omnibus Mot.)  In a supporting affidavit, Wright's attorney, Deep, stated that he had conducted an independent investigation, that he believed someone else had shot Crouse, and that no witness saw the shooter clearly enough to make a positive identification. (*See* Feb. 5, 1996 Omnibus Mot., Deep Aff. ¶¶ 44-46.)  The trial court granted a *Wade*[6] hearing to resolve the identification issue.  (*See* Feb. 14, 1996 Omnibus Mot. Decision.)  At the hearing, the court reserved decision, (*see* Mar. 20, 1996 Hr'g Tr. at 121-22), but subsequently allowed the testimony.

Following Alex Thompson's assault conviction, but before his

_____

[6]*United States v. Wade*, 388 U.S. 218 (1967).

sentencing and the beginning of the murder trial, his attorney negotiated a cooperation agreement with the district attorney in exchange for a lenient sentencing recommendation.  (Tr. at 380.)[7]  Thereafter, on June 4, 1996, Alex Thompson identified Wright as the shooter in a sworn deposition. (Tr. at 381, 429; *see also* June 8, 1996 Deep Mot.)

During the earlier assault trial, Alex Thompson became acquainted with Deep and the other lawyers and they all talked about the events of November 2.  (Tr. at 406.)  Thompson denied, however, that he ever disclosed the identity of the shooter to Deep or the others.  (*Id.*)  Before the murder trial began, Deep moved to withdraw as Wright's attorney. (*See* June 8, 1996 Deep Mot.)  According to Deep, he interviewed Thompson on May 30, 1996, and Thompson told him that Wright was not the shooter.  (*See id.* at ¶¶ 2-4.)  Because Deep anticipated Thompson's contrary testimony at the murder trial, he considered himself a material witness who could not represent Wright.  (See *id.* at ¶¶ 5-6.)  The trial court relieved Deep and ultimately appointed substitute counsel, Richard Ferris, on July 17, 1996.  (*See* July 29, 1996 Ferris Mot.)

---

[7]Thompson was facing a maximum sentence of two and one-third to seven years, and the district attorney agreed to recommend seven months.  (Tr. at 382.)

Two months before the murder trial began, Ferris sought judicial authorization for investigative services.  (*See id.*)  According to Ferris, it was essential to Wright's defense to locate and interview Brent Mowery and several jailhouse witnesses previously incarcerated with Jamie Thompson.  (See *id.* at ¶ 7.)  The court authorized the request.  (*See* July 30, 1996 Order.)  While the actual trial record is sparse, a review of the entire underlying record clearly demonstrates that both the prosecution and the defense anticipated testimony from jailhouse witnesses, and Ferris anticipated testimony concerning jailhouse conversations involving Jamie Thompson and others.  (*See, e.g.*, Tr. at 43.)

Once the murder trial began, the central issue quickly unfolded.  (*See* Opening Statements, Tr. at 17-44.)  Wright's defense was that Jamie Thompson was the real shooter.  (Tr. at 32-44.)  In his opening statement, Wright told the jury: that Jamie Thompson was in jail and had been charged with Crouse's murder, (Tr. at 35); that Donatello knew Jamie Thompson and initially identified him as the shooter, but subsequently changed his story, (Tr. at 38-39); that Donatello and Raspante identified the shooter as wearing a black knit hat similar to the one found by the police in Jamie Thompson's room, (Tr. at 41-42.); and that he might call

14

jailhouse witnesses to support his theory, (Tr. at 43).

The court notes that, having already recited the testimonial details of the events of November 2, it will now turn to the testimony and proceedings as they relate to the identification of the shooter, beginning with the prosecution's case.

The only independent testimony was provided by Brent Mowery, the sole uninvolved witness in the final confrontation and shooting.  Mowery lived directly across the street from Betty Thompson's 513 Mary Street residence.  (Tr. at 481, 486.)  Betty Thompson was Alex Thompson's sister and Jamie Thompson's aunt, and she had a twelve-year-old son, Butter, who was Mowery's close friend.  (Tr. at 481.)  Wright and Alex and Jamie Thompson were frequent visitors at Betty's home, and Mowery often tagged along with them and considered them his friends.  (Tr. at 482.)  Independently, Mowery knew Wright "really well" before the night of the shooting.  (Tr. at 502-05, 511-12.)  As a friend of Mowery's mother, Wright—or "Money" as Mowery knew him—actually lived at Mowery's house for a time after he moved to Utica.  (*See id.*)  At the time of the shooting, Mowery was across the street, looking directly at the faces of Wright and Alex and JamieThompson.  (Tr. at 490, 492.)  He saw Wright

15

pull the gun and shoot, and positively identified Wright in court.  (Tr. at 467-73.)

Ingrassia's identification of Wright never wavered from the initial police investigation through trial.  Sitting in the front passenger seat, he looked through the front window and stared directly at Wright who was ten to twelve feet away.  (Tr. at 199, 232, 235.)  He saw Wright cut in front of Alex Thompson and heard Wright tell Crouse, "Why don't you back the f*** up and get the f*** out of my face."  (Tr. at 209-10.)  He then saw Wright pull a handgun from his waist, point it low in Crouse's direction, and fire two shots.  (Tr. at 212.)  When Crouse backed up, Wright raised the gun and shot him once in the chest.  (Tr. at 213.)  Crouse spun around and ran toward the car, and Wright kept shooting at him.  (Tr. at 213-14.)[8]  After firing five rounds at Crouse, Wright pointed the gun directly at Ingrassia's head, pulled the trigger, and the bullet shattered the windshield.  (Tr. at 214-15.)  When he spoke to the police after the shooting, Ingrassia identified Wright as the tallest of the three, picked his photograph from a lineup, and positively identified him at trial.  (Tr. at 217, 232, 259.)  There

---

[8]Crouse died from two bullet wounds, one to the chest and one in the back.  (Tr. at 177-78, 189.)

16

were no identification inconsistencies in his testimony.

Alex Thompson's cooperation agreement and his relationship to Jamie Thompson were fully disclosed to the jury, and was the subject of cross-examination.  (Tr. at 378-446.)  He testified that as he squared off to fight with Crouse, Wright pulled a handgun from his waist, shot and killed Crouse, and shot at the front passenger in the car. (Tr. at 399-403.) Furthermore, he corroborated the testimonial details provided by Raspante, Ingrassia, and Donatello.  (Tr. at 378-446.)

Raspante identified the tallest of the three protagonists (Wright) as the shooter, but made no in-court identification.  (Tr. at 337, 715.) Donatello also identified the tallest of the three protagonists (Wright) as the shooter, but made no in-court identification.  (Tr. at 284-85.)

The prosecution further argued that a series of Wright's post-arrest statements supported the circumstantial conclusion that he was the shooter.  While incarcerated with Wright in a police holding cell, John Davis, a salesman who had been arrested for unlicensed operation, heard Wright say in response to a conversation about the gun: "The gun is gone. They are never going to find it.  I got rid of it."  (Tr. at 520-21, 528-29.) Lester Brown, incarcerated in the Oneida County Jail on a marijuana

17

possession charge, testified that he spoke with Wright who told him:
Crouse's murder was over a fight and stolen bike; he shot Crouse, not
Jamie Thompson; and the police did not have the gun, which was gone.
(Tr. at 550-51, 564-68.)  David Dickan testified that he was in jail with both
Wright and Jamie Thompson, and heard Wright say to Thompson, "Yo,
man, cheer up.  Why your conscience is bothering you.  I'm the one who
smoked the mother f*****.  You don't see me crying."  (Tr. at 598-99, 604.)
And, Acquaviva testified to Wright's November 3 statement which
essentially denied knowledge of the shooting.  (Tr. at 656-58.)

As to the defense's theory that Jamie Thompson was the real
shooter, Wright elicited the following testimony on cross-examination of
various witnesses: during the initial police investigation, Raspante said the
shooter was wearing a black knit hat, and failed to identify any of the three
as the shooter from a photo array, (Tr. at 349-352.); although Donatello
later identified the tallest of the three as the shooter, he first told the police
that he knew Jamie Thompson from school, that he was wearing a black
knit hat, and that he was the shooter, and he identified Thompson from a
photo array, (Tr. at 290-91, 296, 300, 710); and Acquaviva found a black
knit hat in a room that appeared to be occupied by Jamie Thompson and a

18

do-rag on a couch that appeared to be used by Wright, (Tr. at 641-43).

Wright also called his former counsel, Deep, as a witness. (Tr. at 767-82.) Deep contradicted Alex Thompson's trial testimony, stating that Alex Thompson told him that neither he nor Wright was the shooter. (*See id.*) By process of elimination, the effect of Deep's testimony was that Alex Thompson identified Jamie Thompson as the shooter. (*See id.*) Since Alex Thompson and Deep both testified, and Deep was subject to cross-examination, the court permitted the exculpatory testimony.[9]

Wright's attorney, Ferris, also told the court that he intended to call Mike Reed as a witness, and proffered that Reed would disclose an exculpatory conversation with Ingrassia wherein Ingrassia identified Jamie Thompson as the shooter. (Tr. at 727-28, 737.) Ferris had apparently obtained a statement from Reed through the court-appointed investigator, but had not disclosed the statement to the prosecution. (Tr. at 729.) Ferris informed the court that Reed had earlier told him that he would refuse to testify. (*Id.*) The court expressed concern that if Reed were

---

[9]Deep's testimony supports the court's later conclusion that the parties and the trial court were intimately familiar with hearsay rules and requirements under New York law. There was no foundational argument about the availability of Alex Thompson, and the trial court readily admitted the testimony.

sworn in the presence of the jury but refused cross-examination, the

prosecution would be prejudiced.  (Tr. at 321.)  Accordingly, Reed was

provided advisory counsel, examined by the court outside the presence of

the jury, and agreed to testify.  (Tr. at 731-35.)  Reed then related that

following the murder, he had a conversation with Ingrassia who told him

"Jamie" was the shooter.  (Tr. at 737.)  Although the prosecution objected

to Reed's testimony on foundational grounds, the trial court ruled that

Reed's hearsay testimony was admissible because Ingrassia had testified

and was subject to cross-examination.[10]  (Tr. at 730.)  Ferris also sought

to elicit a conversation between Reed and Jamie Thompson, but the court

sustained the prosecution's objection since Jamie Thompson had not

testified.[11]

Ferris next called Ezekial McClain.  (Tr. at 754.)  In an offer of proof

outside the presence of the jury, Ferris again revealed that McClain had

provided an undisclosed statement.  (*Id.*)  The court stated that it knew

that Ferris intended to elicit testimony about a conversation either between

---

[10]Again, this demonstrates the parties and the trial court's intimate familiarity with New York's hearsay requirements.

[11]Clearly, Jamie Thompson had not testified as Wright had not yet established his "unavailability," and the conversation constituted hearsay.

McClain and Jamie Thompson, or between Thompson and another which McClain overheard.  (Tr. at 755.)[12]  The court requested an evidentiary proffer, noting an obvious hearsay problem.  (*Id.*)  Ferris then disclosed that he also intended to call a second witness to the same conversation.  (*Id.*)  Ferris proffered that both witnesses would testify that Jamie Thompson admitted that he was the shooter.  (Tr. at 755-57.)  The court expressed doubt that such testimony was admissible since Jamie Thompson had not testified.  (Tr. at 757.)

Given the exchanges between the court and counsel, and in light of defense counsel's opening statement, it is clear that Jamie Thompson provided the prosecution with a sworn pretrial statement identifying Wright as the shooter.  (Tr. at 36-37, 757-58.)  According to Ferris, he had a

_____

[12]Unfortunately, and as is all too common in both state and federal proceedings, the underlying record is barren of any pretrial or off-the-record trial conversations between the court and counsel regarding evidentiary issues.  Obviously, the court had no basis to comment on the problem without such conversations.  If there were trial briefs, none have been produced by either party, nor were they a part of the subsequent state court appellate record.  In any event, the official record and events involving Reed and McClain clearly indicate that Wright's attorney and the court fully anticipated hearsay and foundational problems regarding certain witnesses.  (*See, e.g.*, Oct. 30, 1996 Post-Trial Mot. & Sentencing Tr. (referencing the issue and off-the-record trial conversations); *see also People v. Brensic*, 70 N.Y.2d 9 (N.Y. 1987); *People v. Settles*, 46 N.Y.2d 154 (N.Y. 1978).)

conversation with the court and requested production of Jamie Thompson in court so that he could satisfy the "availability prong" of the declaration against penal interest exception to the hearsay rule.  (Tr. at 758; *see also* Oct. 30, 1996 Post-Trial Mot. & Sentencing Tr.)  Ferris told the court that he had not yet spoken to Thompson to see whether he would testify as a defense witness.  (Tr. at 758.)

Judge Bianchini concluded from the exchange between the trial court and counsel that Wright effectively notified the court that he was raising a constitutional due process claim.  Because the court disagrees with that conclusion, it recites the exchange verbatim:

> The Court: Your position is that you think I should allow hearsay testimony with regard to statements made by someone who is not even a defendant in this case.  How is that an exception to the hearsay rule?
>
> Mr. Ferris: Your Honor, I would suggest to the Court that this is an unusual case, in that if the Court will permit me, I believe I can prove that right now there are pending murder charges against Jamie Thompson.
>
> The Court: You've already presented testimony about that.
>
> Mr. Ferris: Well, I don't know if I presented testimony that they are currently pending, but --
>
> The Court: Yes, you did.  Cross-examination of the witnesses.

22

Mr. Ferris: And I would suggest it is an unusual case in that instance.

The Court: The District Attorney cannot cross-examine someone, can't cross-examine the proponent of the conversation.  It is hearsay.
Mr. Ferris: I'm not permitted to cross-examine Jamie Thompson either, your Honor?

The Court: Call him to the stand.

Mr. Ferris: Well, I intend to try to do that.  And I feel that, maybe I'm getting ahead of myself, I feel that's an unfairness to my client.

The Court: I haven't heard -- there is no foundation for it at this point.  Anything else you want to say?

Mr. Ferris: No, not yet.

The Court: Mr. Fitzgerald, what's your position?

Mr. Fitzgerald: Your Honor, the reason we asked for the offer of proof, that is what we expected counsel will be proposing to put in, hearsay evidence.  It fits none of the hearsay exceptions that I am aware of, and we are objecting to him testifying in any regards to that.

The Court: Do you want to be heard further before I make my rulings?

Mr. Ferris: Is this ruling just with respect to Ezekial McClain, your Honor?

The Court: Sure.  That's all that's been proposed, at this point.

Mr. Ferris: I have nothing else to say, other than, no, I don't.

The Court: I'm not going to permit Mr. McClain to testify as you propose in this matter.  It is clearly hearsay, and I don't see any exception for the hearsay rule, and so I'm not going to allow the testimony.

Mr. Ferris: Exception.

The Court: Do you have a next witness?

Mr. Ferris: Yes, I do.  I have Reggie Leggett, your Honor.

Mr. Fitzgerald: Your Honor, counsel has already indicated in his arguments that that same testimony would be elicited from this witness.

The Court: Is that the Reggie you referred to earlier?

Mr. Ferris: Yes, your Honor.

The Court: Is that the same conversation?

Mr. Ferris: I believe it is, your Honor.

The Court: It is still hearsay.

Mr. Ferris: He was a participant in this conversation with Jamie Thompson.

The Court: But he's going to testify to hearsay.  He's going to testify as to what Jamie Thompson told him.

Mr. Ferris: Yes.  I would once again argue it is a unique circumstance that Jamie is also charged in this case, and it appears that I may be unable to get a chance to examine Jamie on the witness stand myself, and I think it is a case of first impression, your Honor, to be honest with you.

24

The Court: He's not a defendant in this case, only Mr. Wright is a defendant in the charges contained in this indictment, which this jury is considering, and in any event, the statements of one codefendant cannot be used against another codefendant.

Mr. Ferris: They are not codefendants.

The Court: Well, you're telling me they are.  One has been charged in one court and one in the other for the same incident, which makes them, quote, unquote, "defendants."

Mr. Ferris: Your Honor, I don't believe I would characterize it that way.

The Court: Well, okay.  But in any event, it is still hearsay.  Mr. Fitzgerald, your position?

Mr. Fitzgerald: Same position.

The Court: My ruling is the same.

Mr. Fitzgerald: Your Honor, I'd like an exception for that, too.

(Tr. at 758-63.)

The record offers no further explanation as to why Wright's counsel elected to proceed as he did after this exchange.  The court had produced Jamie Thompson so that Wright could call him and meet the foundational predicate for introduction of the hearsay testimony—unavailability. Counsel elected not to do so.  Nothing in the record demonstrates that Thompson would have refused to testify if called.  There is, however,

further amplification in the sentencing and post-trial motion transcript.

(*See* Oct. 30, 1996 Post-Trial Mot. & Sentencing Tr.; *see also* N.Y. CRIM.

PROC. LAW § 330.30.)[13]

Apparently, Ferris renewed his objections to the exclusion of the

McClain and Leggett testimony on hearsay grounds.  (*See* Oct. 30, 1996

Post-Trial Mot. & Sentencing Tr. at 5-6.)  In response, the court stated:

> You're alleging that Mr. Thompson was the declarant.
> There are certain limited circumstances in which a declaration
> against penal interests other than by someone other than the
> defendant are allowed into evidence at trial.  Under the
> guidelines set forth in the cases such as People versus
> Settles, which outline when that type -- that gross type of
> hearsay is admissible is a declaration against penal interests,
> the first and foremost is the declarant is unavailable.  The
> declarant was available here.  At your request, Mr. Ferris, I
> had Jamie Thompson downstairs, brought downstairs by the
> sheriff's department so that you could call him as a witness
> and, in fact, you knew he was there and, in fact, as I recollect,
> you reported that you had talked to him and decided not to use
> him.  So number one, that exception to the hearsay rule does
> not apply because the declarant was, in fact, available and
> could have been called as a witness during the course of this
> trial.
>      Secondly, this declarant, Jamie Thompson, and you and
> the defendant were aware of it, had given a statement under
> oath to the district attorney inculpating your defendant.  So
> Thompson admitted in a sworn statement that Deshard Wright

---

[13]While the transcript reflects that Wright filed a written motion, (*see* Oct. 30, 1996 Post-Trial Mot & Sentencing Tr. at 3), a written motion is not a part of the habeas record.

is the individual who shot Robbie Crouse.  So obviously that does not constitute an exception to the hearsay rule and, for that reason, the Court feels its ruling was certainly justified and proper.  I'm going to deny that basis -- that aspect of your motion as well.

(*See id.* at 8-9.)

In its instructions, the court provided the jury with a complete

identification charge as follows:

> [A] main issue in this case is the identification of the defendant, Deshard Wright, as a person who committed the crimes which are outlined in the indictment, on or about November 2nd, 1995.  As I have previously mentioned, the People have the burden to prove to your satisfaction beyond a reasonable doubt, not only all of the essential elements of the crimes, as I will soon define those elements to you, but also that it was the defendant, Deshard Wright, who was the person who committed those crimes.  Even if you are convinced beyond a reasonable doubt that a serious crime or crimes have been committed, this does not end your deliberations.  You must also be satisfied beyond a reasonable doubt that it was the defendant who was the person that committed these crimes. You, the jury, are the sole judges of the rightness, indeed the certainty of identification.  You must therefore examine with great care and scrutinize carefully all of the evidence on the issue of identity, and as you have been instructed, you must be convinced beyond a reasonable doubt that the defendant is the person who, in fact, committed this crime or these crimes. If you are not so satisfied, then you must, of course, acquit the defendant.

(Tr. at 893-94.)  The jury convicted Wright of murder, attempted murder,

and illegal possession of a handgun.  (Tr. at 931-32.)

27

Following sentencing and the entry of judgment, Wright—

represented by new appellate counsel—appealed to the New York State

Appellate Division, Fourth Department.  (*See* July 1, 1999 Wright

Appellate Br. at 11.)  In his recitation of appellate issues, Wright asserted

that by refusing to permit the hearsay testimony of McClain and Leggett as

to Jamie Thompson's declaration against penal interest, the trial court

denied him a fair trial.  (See *id.* at 11-12.)  While Wright, for the first time,

cited *Chambers v. Mississippi*, 410 U.S. 284 (1973), for the proposition

that due process requires that a defendant be afforded the right to call

witnesses on his behalf, the argument focused almost exclusively on the

application of *People v. Settles*, 46 N.Y.2d 154 (N.Y. 1978), to the

underlying record.  (*See* July 1, 1999 Appellant Br. at 13-19.)  Conceding

that he had failed to establish Jamie Thompson's unavailability as required

by *Settles* and that he had failed to request a *Settles* hearing, *see People

v. Brensic*, 70 N.Y.2d 9, 17 (N.Y. 1984), Wright argued that the facts

warranted an exception to clear New York authority precluding such

hearsay testimony absent compliance with foundational requirements

regarding availability and trustworthiness.  (*See* July 1, 1999 Appellant Br.

at 15-18.)  In its brief, the prosecution relied on settled New York law and

28

Wright's concession, pointing out that Wright had failed to establish the foundational requirements of unavailability and trustworthiness. (*See* Aug. 10, 1999 Resp't Br. at 4-7.) In his reply, Wright reiterated his original arguments with no reference to *Chambers*. (*See* Aug. 16, 1999 Appellant Reply Br. at 1-4.)

In a unanimous decision, the New York Appellate Division, Fourth Department, affirmed the judgment. *See People v. Wright*, 269 A.D.2d 831 (4th Dep't 2000). As the decision relates to Judge Binachini's due process and procedural default conclusions, it states:

> Defendant failed to preserve for our review his contention that hearsay statements made to witnesses by an individual implicating himself in the shooting should have been received as declarations against penal interest (*see, People v. Steward*, 256 AD2d 1147, 1148, *lv denied* 93 NY2d 879). In any event, defendant failed to demonstrate that the declarant was unavailable as a witness at trial (*see*, *People v. Thomas*, 68 NY2d 194, 197, *cert denied* 480 US 948; *People v. Settles*, 46 NY2d 154, 167; *People v. Dove*, 262 AD2d 995, *lv denied* 94 NY2d 822).
>
> ....
>
> Defendant failed to preserve for our review his contentions that the conduct of County Court denied him a fair trial and that the court erred in admitting certain evidence (*see,* CPL 470.05 [2]), and we decline to exercise our power to review those contentions as a matter of discretion in the interest of justice (*see,* CPL 470.15 [6] [a]).

29

*Id.* at 831.  The New York Court of Appeals denied leave to appeal. *People v. D.*, 94 N.Y.2d 946 (N.Y. 2000).

Arguing ineffective assistance of trial counsel, Wright subsequently moved to vacate his judgment.  (*See* Feb. 2, 2001 Wright Mot.; *see also* N.Y. CRIM. PROC. LAW § 440.10(1)(h).)  Noting that new appellate counsel failed to raise an ineffective assistance of counsel claim on direct appeal, the trial court denied the motion.  (*See* May 9, 2001 Decision & Order (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c) (procedural default)).)

## IV. <u>Analysis</u>

As to Wright's due process claim, Judge Bianchini concluded that the Appellate Division's finding of procedural default found no clear support in state law.  Thus, he concluded that the claim was not barred and merits review was authorized.  (*See* 2d R&R at 5-6, 10-14, Dkt. No. 31 (summarizing the first R&R's conclusions).)  On the merits, Judge Bianchini concluded that Wright's due process right to present exculpatory evidence was violated by New York's mechanistic application of its hearsay rule in contravention of Supreme Court precedent.  (*See id.*) Judge Bianchini rejected respondent's sole countervailing argument that the claim was procedurally barred, which he raised in his original response

30

papers.  (*See id.*)

Objecting to the first R&R, respondent challenged Judge Bianchini's procedural bar conclusion and addressed the merits of the claim for the first time.  (*See* Objections, Dkt. No. 29.)  In his second R&R, Judge Bianchini recommended that the court refuse to consider arguments raised for the first time in the objections.  (*See* 2d R&R at 6-9, Dkt. No. 31.)  Respondent objected to this latter recommendation.  (*See* Objections, Dkt. No. 34.)  Wright did not object to either R&R.

As to the due process claim, the court has undertaken de novo review by examining the entire record and independently assessing the magistrate's factual and legal conclusions.  Thus, in the context of this case, the court has assessed the dual underpinnings of Judge Bianchini's conclusions—procedural bar and the merits of the due process claim. While the court concurs with much of Judge Bianchini's analytical framework, it disagrees with his assessment of the record and his resulting conclusions.  Thus, the court declines to adopt the due process recommendation because the state court did not unreasonably apply *Chambers*, and because Wright procedurally defaulted in any event.

While procedural default sometimes precludes merits review, the

court elects to consider the merits first as the due process issues are intertwined.  The court will then evaluate procedural default, Judge Bianchini's recommendations regarding Wright's remaining claims, and the recommendation that the court disregard respondent's objections.

**A.**   **The Due Process Claim: Merits Review and Procedural Default**

**1.**   **Merits Review**

**a.**   **The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court recently admonished federal courts conducting habeas review:

> The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law.  Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources. Those resources are diminished and misspent, however, and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance.

*Harrington v. Richter*, 131 S.Ct. 770, 780 (2011).  Under 28 U.S.C. § 2254(d), merits review is limited.  *See id.* at 780.  According to the statute:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As to whether a decision rests on the merits, it does not have to expressly state as much, nor need it explain its reasoning.  Instead, it is presumed that it did absent some indication that state procedural principles dictated a contrary result.  *See Richter*, 131 S.Ct. at 784-85.  In any event, a petition may be denied on the merits regardless of procedural default.  *See* 28 U.S.C. § 2254(b)(2).

Pursuant to § 2254(d), merits relief may not be granted unless the state court decision was contrary to federal law then clearly established in the holdings of the Supreme Court, or involved an unreasonable application of such law, or was based on an unreasonable determination of the facts.  *See Richter*, 131 S.Ct. at 785.  As the Supreme Court has said, "[t]he pivotal question is whether the state court's application of the [constitutional] standard was unreasonable."  *Id.*  Under § 2254(d)(1), "'an unreasonable application of federal law is different from an incorrect

33

application of federal law.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)) (emphasis omitted).  Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Furthermore, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664). As Judge Bianchini observed, state court evidentiary rulings rarely warrant habeas relief.  (*See* 1st R&R at 18, Dkt. No. 26 (citing *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983)).)  Ultimately, a habeas court applying § 2254(d) "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Richter*, 131 S.Ct. at 786.  This standard is rigorously difficult to meet because habeas relief is reserved for constitutional breakdowns.  It is not a mechanism to foster a federal

appeal; nor is it a means to frustrate a state's sovereign power, especially

since states are the primary forum for constitutional challenges.  *Id.* at

787.  So too, it is Wright's burden to show that New York applied clearly

established law in an unreasonable manner.  *See Acosta v. Artuz*, 575

F.3d 177, 184 (2d Cir. 2009).[14]

**b.    Due Process and *Chambers***

It is well established under the Fifth and Fourteenth Amendments

that a defendant has a constitutional right to present witnesses in his own

defense and challenge the state's allegations through the proper

introduction of exculpatory evidence.  *See, e.g.*, *Chambers*, 410 U.S. at

294, 300.

Citing *Lilly v. Virginia*, 527 U.S. 116, 130 (1999), and its quoted

*Chambers* excerpt, 410 U.S. at 300, Judge Bianchini stated the *Chambers*

holding as follows: "[T]he Due Process Clause affords criminal defendants

the right to introduce into evidence third parties' declarations against penal

---

[14]Even if Wright were to make this showing, the court would still
have to consider whether any constitutional error is harmless, *see Howard
v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005), which requires an evaluation
of whether the error had a substantial and injurious effect or influence in
determining the outcome.  *See Fry v. Pliler*, 551 U.S. 112, 121 (2007).
The court need not address this contingency since it concludes that Wright
does not succeed.

interest—their confessions—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.'"  (*See* 1st R&R at 21-22, Dkt. No. 26.)  From this statement, he concluded that *Chambers* requires the admission of third-party confessions bearing a substantial indicia of reliability.  (*See id.*)  He then found that Leggett and McClain's testimony was reliable, that the exclusion of that reliable exculpatory testimony deprived Wright of a fair trial, and chastised the state courts for having failed to consider the issue.  (*See id.*)  In this court's view, Judge Bianchini misconstrued *Chambers* and the underlying record.

As subsequent Supreme Court opinions interpreting *Chambers* reflect, the *Chambers* Court was confronted with unique facts and an unjust result.  Chambers was charged with murder after he allegedly shot a deputy four times with a .22 pistol outside a Mississippi bar during a patron melee.  *See Chambers*, 410 U.S. at 285-86.  The prosecution's case relied principally on the testimony of two deputies at the scene, one of whom identified Chambers as the shooter.  *See id.* at 286.  No gun or other evidence was found at the scene, and the police conducted no further investigation after Chambers's arrest.  *See id.* at 286-87.  After the

shooting, exculpatory evidence surfaced identifying one McDonald as the

actual shooter.  McDonald was present at the scene; he owned a .22

pistol; he was identified as the shooter by a lifelong friend and eyewitness;

and most importantly, he confessed to Chambers's attorneys in a sworn

pretrial statement and independently confessed to three other witnesses.

*See id.* at 287-89.  Before trial, McDonald repudiated his confessions, *see*

*id.* at 288, whereupon Chambers requested that the court produce

McDonald as a witness and permit cross-examination of him as an

adverse witness.  Subsequently, Chambers called McDonald, and

successfully introduced his sworn confession.  However, McDonald again

repudiated the confession and the trial court refused cross-examination,

relying on Mississippi's "no voucher" rule.  Chambers then sought to call

the three other exculpatory witnesses, and the court excluded their

testimony as hearsay because Mississippi did not recognize declarations

against penal interest as exceptions to the hearsay rule.  *See id.* at 289,

291-94, 298.

As to Mississippi's voucher rule and its failure to recognize

declarations against penal interest as hearsay exceptions, the Supreme

Court kindly noted that Mississippi's voucher rule had long since outlived

its usefulness in the federal legal system and in the rest of the country,

*see id.* at 296 n.9, and, given that the penal interest hearsay exception

was readily accepted in other jurisdictions, the hearsay statements at

issue should have been admitted because they bore sufficient indicia of

reliability.  *See id.* at 298, 300-01.  Significantly, and as it relates to the

availability and reliability issues in this case, the Supreme Court observed:

> Finally, if there was any question about the truthfulness of the
> extrajudicial statements, McDonald was present in the
> courtroom and was under oath.  He could have been cross-
> examined by the State, and his demeanor and responses
> weighed by the jury.  The availability of McDonald significantly
> distinguishes this case from the prior Mississippi [hearsay
> cases] ... [where] ... the declarant was unavailable at the time
> of trial.

*Id.* at 301 (citations omitted).  In this fact-specific context, the full

*Chambers* holding is as follows:

> Few rights are more fundamental than that of an
> accused to present witnesses in his own defense.  *In the
> exercise of this right, the accused, as is required of the State,
> must comply with established rules of procedure and evidence
> designed to assure both fairness and reliability in the
> ascertainment of guilt and innocence.*  Although perhaps no
> rule of evidence has been more respected or more frequently
> applied in jury trials than that applicable to the exclusion of
> hearsay, exceptions tailored to allow the introduction of
> evidence which in fact is likely to be trustworthy have long
> existed.  The testimony rejected by the trial court here bore
> persuasive assurances of trustworthiness and thus was well

within the basic rationale of the exception for declarations against interest.  That testimony was also critical to Chambers' defense.  In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process.  *In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.*

*Id.* at 302-03 (citations omitted and emphasis added).

Since *Chambers*, the Supreme Court has frequently made two consistent observations narrowing its precedential value.  First, states retain the unquestioned power to exclude exculpatory evidence through rules that serve the interests of fairness and reliability even if the defendant would prefer otherwise.  *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *United States v. Scheffer*, 523 U.S. 303, 308-09 (1998); *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996); *Taylor v. Illinois*, 484 U.S. 400, 410-11 & n.15 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 & n.11 (1987); *Ohio v.*

*Roberts*, 448 U.S. 56, 64 (1980).  In fact, "[t]he accused does not have an unfettered right to offer testimony that is ... otherwise inadmissible under standard rules of evidence....  '[T]he accused, as is required of the State, must comply with established rules of ... evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Taylor*, 484 U.S. at 410, 411 n.15 (quoting *Chambers*, 410 U.S. at 302).  Secondly, *Chambers* is limited to its facts and circumstances, and neither established any new principles of constitutional law nor otherwise diminished respect for state trial rules and procedures.  *See Egelhoff*, 518 U.S. at 52 (citing *Chambers*, 410 U.S. at 302-03).  Thus, as relevant here, the Court has observed:

> In other words, *Chambers* was an exercise in highly case-specific error correction.  At issue were two rulings by the state trial court at Chambers'[s] murder trial: denial of Chambers'[s] motion to treat as an adverse witness one McDonald, who had confessed to the murder for which Chambers was on trial, but later retracted the confession; and exclusion, on hearsay grounds, the testimony of three witnesses who would testify that McDonald had confessed to them.  We held both these rulings were erroneous, the former because McDonald's testimony simply *was* adverse, and the second because the statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," and were "well within the basic rationale of the exception for declarations against interest."  Thus, the holding of *Chambers*—if one can be discerned from

such a fact-intensive case—is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Id.* at 53 (quoting *Chambers*, 410 U.S. at 297-302; *see also Scheffer*, 523 U.S. at 308-09, 316.  So too, the Second Circuit has acknowledged these *Chambers* limitations.  *See Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006); *Giap v. Greiner*, 185 F. App'x 79, 80 (2d Cir. 2006); *Rodriguez v. Artuz*, 123 F. App'x 428, 429 (2d Cir. 2005); *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004); *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003).

Thus, Judge Bianchini simply read *Chambers* far too broadly when he concluded that Wright's due process rights were violated because reliable evidence of Jamie Thompson's third-party confession was excluded.  (*See* 1st R&R at 21-22, Dkt. No. 26.)  His conclusion failed to consider the *Chambers* limitation; namely, Wright did not have an unfettered right to offer testimony otherwise inadmissible under standard rules of evidence.  *See, e.g.*, *Taylor*, 484 U.S. at 410-11 & n. 15.  Just as the state is obligated to do, Wright was required to comply with established rules of evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.  *See id.*  Thus, the

critical question is whether the New York hearsay exception is such an

established rule, and whether the trial court correctly or mechanistically

applied it.  As the subsequent analysis reflects, New York's rule is not only

well established, but it parrots the federal rule, and the trial court

committed no error in applying it.

**c.    Declarations Against Penal Interest**

In New York, the principal rationale for excluding hearsay is the

absence of cross-examination which allows the jury to assess veracity,

accuracy of perception, and the ability to recall.  *See* WILLIAM PAYSON

RICHARDSON & JEROME PRINCE, PRINCE, RICHARDSON ON EVIDENCE § 8-101

(11th ed. 2008).  The Supreme Court agrees:

> The hearsay rule ... is based on experience and
> grounded in the notion that untrustworthy evidence should not
> be presented to the triers of fact.  Out-of-court statements are
> traditionally excluded because they lack the conventional
> indicia of reliability: they are usually not made under oath or
> other circumstances that impress the speaker with the
> solemnity of his statements; the declarant's word is not subject
> to cross-examination; and he is not available in order that his
> demeanor and credibility may be assessed by the jury.

*Chambers*, 410 U.S. at 298 (citation omitted).  The federal rules of

evidence are in accord.  *See* JACK B. WEINSTEIN & MARGARET A. BERGER, 5

WEINSTEIN'S FEDERAL EVIDENCE § 802.02[2][3] (2d ed. 2010).  Since

*Chambers*, the Supreme Court has reaffirmed its view that hearsay

exclusion is a firmly-rooted and established evidentiary rule designed to

assure both fairness and reliability in the ascertainment of guilt and

innocence.  For instance, the Court said in *Williamson v. United States*:

> The hearsay rule ... is premised on the theory that out-of-court statements are subject to particular hazards.  The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might have been misunderstood or taken out of context by the listener.  And the ways in which these dangers are minimized for in-court statements—the oath, the witness'[s] awareness of the gravity of the proceedings, the jury's ability to observe the witness'[s] demeanor, and, most importantly, the right of the proponent to cross-examine—are generally absent for things said out of court.

512 U.S. 594, 598 (1994); *see also Scheffer*, 523 U.S. at 309 ("State and

Federal Governments unquestionably have a legitimate interest in

ensuring that reliable evidence is presented to the trier of fact in a criminal

trial.  Indeed, the exclusion of unreliable evidence is a principal objective

of many evidentiary rules." (citing, inter alia, the federal hearsay rule)).

As to the relationship between a witness's availability at trial (non-

hearsay) and the efficacy of cross-examination to prevent hearsay

problems, the *Chambers* Court itself stated:

> [The right to cross-examine allows the accused to] test the

43

witness'[s] recollection, to probe into the details, [and] to 'sift' his conscience so that the jury might judge for itself whether [the witness's] testimony was worthy of belief....  The right of cross-examination ... is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'  It is ... 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal'.... [I]ts denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined.

*Chambers*, 410 U.S. at 295 (citations omitted).

*Chambers* posed a dilemma because Mississippi had no declaration against penal interest exception permitting the hearsay testimony of Chambers's exculpatory witnesses.  Wright's situation was clearly distinguishable because New York recognizes the exception.  Thus, hearsay declarations against penal interest are admissible in New York if four preconditions are met: (1) the declarant is unavailable; (2) the declarant was aware when the statement was made that it was against his penal interest; (3) the declarant had competent knowledge of the facts; and (4) there is some proof independent of the statement itself which tends to confirm the facts asserted in the statement.  *See* PRINCE, RICHARDSON ON EVIDENCE § 8-403; *see also People v. Morgan*, 76 N.Y.2d 493, 497-98 (N.Y. 1990); *Brensic*, 70 N.Y.2d at 15; *People v. Thomas*, 68

44

N.Y.2d 194, 197 (N.Y. 1986); *Barnes v. Burge*, 372 F. App'x 196, 201 (2d Cir. 2010) (reciting New York elements); *Rodriguez*, 123 F. App'x at 430 (same).  Furthermore, the Second Circuit has suggested that the necessity of meeting the four elements is "neither arbitrary nor disproportionate to the state's legitimate interest in excluding unreliable hearsay from jury consideration." *Rodriguez*, 123 F. App'x at 430.  The Circuit's view is hardly surprising since New York's formulation of the exception is almost identical to the federal rule.  *See United States v. Wexler*, 522 F.3d 194, 201-02 (2d Cir. 2008) (citing FED. R. EVID. 804(b)(3)).

In New York, the trial court often conducts a so-called *Settles* hearing outside the presence of the jury to determine admissibility although that hearing usually focuses on the reliability element.  *See Brensic*, 70 N.Y.2d at 16; *Settles*, 46 N.Y.2d at 167-69; *Bretti v. Kuhlman*, 107 F.3d 2, No. 96-2003, 1997 WL 76872, *2 (2d Cir. Feb. 21, 1997) (unpublished).  Federal courts typically conduct a similar hearing.  *See* 5 WEINSTEIN'S FEDERAL EVIDENCE § 804.06[5][i].  However, a court never reaches a *Settles* reliability issue unless the first element is satisfied; namely, the hearsay declarant is unavailable.

45

Thus, unavailability is the paramount condition precedent to the admission of declarations against penal interest both federally and in New York.  *See id.*, § 804.03[1]; PRINCE, RICHARDSON ON EVIDENCE § 8-404; *Thomas*, 68 N.Y.2d at 197 ("[T]he declarant must be unavailable to give testimony, whether by reason of absence from the jurisdiction, refusal to testify on constitutional grounds or death ...." (citations omitted)); *see also Singleton v. Lefkowitz*, 583 F.2d 618, 627 n.14 (2d Cir. 1978) (citing *People v. Brown*, 26 N.Y.2d 88, 94 (1970) (noting that declarant must be unavailable); *United States v. Byrd*, 210 F. App'x 101, 102 (2d Cir. 2006) (noting unavailability as a precondition of federal rule); 5 WEINSTEIN'S FEDERAL EVIDENCE § 804.06[4][a] (same).

Accordingly, as a precondition to the admissibility of the Leggett and McClain testimony, Wright had to first establish Jamie Thompson's unavailability.[15]  He failed to do so as the trial court consistently told him, and as the Appellate Division specifically declared in its opinion.  As the record unequivocally reflects, the trial court anticipated that Wright would call Thompson and ordered him produced, and Thompson was in the

---

[15]Judge Bianchini reached the same conclusion.  (*See* 1st R&R at 20, Dkt. No. 26.)

basement of the courthouse available to testify.  For tactical reasons,

Wright declined to call him, and never established his unavailability.  Thus,

the hearsay testimony of Leggett and McClain was clearly inadmissible, a

result that would have been the same had the issue arisen federally.[16]  On

the other hand, had Wright established Thompson's unavailability, the trial

court would have likely permitted the Legget and McClain testimony if its

reliability was established at a *Settles* hearing.  *Cf. People v. Contreras*,

28 A.D.3d 393, 394 (1st Dep't 2006) (declarant unavailable); *People v.*

_____

[16]The record does not reflect the reason for Wright's tactical decision.  Perhaps he was comfortable that his former attorney had credibly placed the identity issue before the jury through testimony about the hearsay statement of Alex Thompson.  And perhaps he was concerned about the quality of the Leggett and McClain testimony, especially since it appears that Jamie Thompson—if called—might have denied the statement in light of his sworn pretrial statement to the contrary.

In any event, the court notes the advice of Judge Weinstein: "If the prior statement is crucial to the party's case, there is little risk in calling the declarant.  If the declarant's testimony tracks the substance of the prior statement, no problem is raised.  If the testimony is inconsistent with the prior statement, there is no greater risk than if the statement were offered under a [hearsay] exception.  If the hearsay statement were admitted, the opponent could call the declarant and 'examine the declarant on the statement as if under cross-examination.'"  5 WEINSTEIN'S FEDERAL EVIDENCE, § 802.03[5][b].  Furthermore, in New York, and unlike the federal rule, the prior inconsistent statement of a testifying witness is admissible as substantive evidence, not just impeachment.  *See* PRINCE, RICHARDSON ON EVIDENCE § 8-404 (distinguishing FED. R. EVID. 801(d)(1)(A)).

*Pugh*, 258 A.D.2d 674, 675 (2d Dep't 1999) (same); *People v. Darrisaw*, 206 A.D.2d 661, 663-64 (3d Dep't 1994) (same); *People v. Smith*, 195 A.D.2d 112, 121 (1st Dep't 1994) (same).

Lastly, Second Circuit precedent supports the conclusion that there was no unconstitutional and arbitrary application of New York's hearsay rule precluding Wright's exculpatory defense. *Cf. Hawkins v. Costello*, 460 F.3d 238, 243-45 (2d Cir. 2006); *Giap*, 185 F. App'x at 80; *Rodriguez*, 123 F. App'x at 431; *Nicholson v. Walker*, 100 F. App'x 848, 850 (2d Cir. 2004); *Mantello*, 333 F.3d at 59, 62; *Bretti*, 103 F.3d 2, 1997 WL 76872, at *2; *Grochulski v. Henderson*, 637 F.2d 50, 53-55 (2d Cir. 1980).

In summary, Wright had a constitutional due process right to challenge the State's allegations through the *proper* introduction of exculpatory evidence.  By failing to establish Jamie Thompson's unavailability through means readily available to him, he failed to comply with New York's unquestioned power to exclude exculpatory evidence through a rule designed to serve the interests of fairness and reliability— hearsay.  There was no mechanistic application of New York's hearsay rule.  Both the New York trial and appellate courts reached a conclusion that fairminded jurists would agree comports with *Chambers* and later

Supreme Court cases interpreting and applying *Chambers*.  Accordingly,

Wright's habeas corpus petition must be denied on the merits because he

has failed to satisfy his burden of demonstrating that New York applied

clearly established law in an unreasonable manner, or unreasonably

applied such law, or based its decision upon an unreasonable

determination of the facts.  *See Richter*, 131 S.Ct. at 785.

**2.    Procedural Default**

Whether the state appellate court rejected Wright's constitutional

claim as procedurally defaulted poses a closer question.  Nonetheless,

and upon de novo review, the court rejects Judge Bianchini's conclusion

that Wright preserved his claim.  While the court has no fundamental

disagreement with Judge Bianchini's recitation of the appropriate legal

principles, the court does disagree with the conclusions drawn from the

underlying record which were then applied to the procedural default

doctrine.

Quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989), the first R&R

aptly observed: "Where the highest state court that rendered a judgment in

the case 'clearly and expressly states that its judgment rests on a state

procedural bar,' such procedural default constitutes independent and

adequate state grounds to deny habeas relief." (1st R&R at 12-13, Dkt. No. 26.) Federal courts are generally barred from reviewing defaulted claims unless petitioners demonstrate cause and resulting prejudice, or unless the failure to consider claims will result in miscarriages of justice. (*See id.* at 13.) If a state procedural bar has no fair or substantial basis in state law, it does not preclude merits review. *See id.*[17]

With these principles in mind, Judge Bianchini concluded: (1) by using the word "unfair," Wright notified the trial court that he objected to the exclusion of the Leggett/McClain testimony on constitutional due process grounds; (2) the Appellate Division found the claim procedurally defaulted but offered no explanation for its decision other than a citation to a single case which, in turn, cited New York's "contemporaneous objection" rule under N.Y. CRIM. PROC. LAW § 470.05(2);[18] (3) there was an inadequate basis in state law for the finding of default because Wright lodged a contemporaneous objection; and (4) absent procedural default,

[17]Of course, the fact that a state appellate court alternatively rules on the merits and procedural bar does not necessarily mean that a claim is subject to federal habeas review on the merits. *See Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (citation omitted).

[18]This is also commonly referred to as a "preservation" rule.

relief was warranted on the merits.

In his objections, respondent argued that Judge Bianchinni misread the underlying record and the Appellate Division's decision regarding default.  In his view, Wright's failure to contemporaneously and specifically object on constitutional grounds before the trial court constituted default, and served as the basis for the Appellate Division's ruling.  (*See* Objections at 13-18, Dkt. No. 29.)  In his second R&R, Judge Bianchini rejected those arguments, again concluding that Wright preserved the due process argument at trial and that the Appellate Division's finding of procedural default was unclear.  (*See* 2d R&R at 10-14, Dkt. No. 31.)

Upon de novo review, the court disagrees with Judge Bianchini's conclusion that Wright preserved his due process argument by timely and specifically objecting.  Instead, the record indisputably reflects that Thompson's "unavailability" as a precondition to the Leggett/McClain hearsay testimony was the only conversation ongoing between the court and counsel before, during, and after trial.  In this context, and after the trial court explained to Wright that Thompson had been produced and was available, Wright proclaimed unfairness.  The "unfair" comment was in the context of having to first call Thompson before he could produce Leggett

51

and McClain, and had nothing to do with *Chambers* or any other due process issue.  This conclusion is further buttressed by Wright's post-trial motion that limited argument to the hearsay availability issue.  It is also supported by the fact that hearsay and *Settles* were consistent topics throughout the trial during the testimony of several witnesses.  Not once did *Chambers* or due process surface until new counsel mentioned the case and issue—in passing—in her appellate brief.

Especially in light of the undisputed underlying trial record, the court further disagrees with Judge Bianchini's reliance on the quote from the first paragraph of the appellate decision as articulating its basis for finding procedural default.  Instead, the first paragraph reasonably appears to reference Wright's failure to establish Thompson's unavailability and the corresponding conclusion that a *Settles* hearing was not warranted.  In the second paragraph, the decision appears to clearly state that "[d]efendant failed to preserve for our review his contentions that the conduct of County Court denied him a fair trial ... (*see* CPL 470.05[2])."   *Wright*, 269 A.D.2d at 831.

New York's contemporaneous objection rule is firmly and clearly established as a basis for procedural default.  *See, e.g.*, *Velasquez*, 898

F.2d at 9 (citing contemporaneous objection rule, N.Y. CRIM. PROC. LAW §
470.05); *Rodriguez v. Schriver*, 392 F.3d 505, 509-10 (2d Cir. 2004)
(same).  Pursuant to the rule, a defendant must make his position known
so that the trial court understands the nature and scope of the matter he
contests and can deal with the issue at the time it arises.  *See Garvey v.
Duncan*, 485 F.3d 709, 714 (2d Cir. 2007).[19]  Furthermore, the rule is
violated if an objection relies on evidentiary principles alone and fails to
alert the court to contemporaneous constitutional concerns.  *See People
v. Angelo*, 88 N.Y.2d 217, 222 (N.Y. 1996); *see also, e.g.*, *Rodriguez*, 392
F.3d at 510 (holding that the contemporaneous objection rule applies to
constitutional *Batson* challenge).

Nonetheless, even a firmly-established and regularly-followed rule
might be inadequate to preclude habeas review if its application is no
more than a ritual serving no state interest.  *See Richardson v. Greene*,
497 F.3d 212, 218 (2d Cir. 2007).  As to adequacy, federal courts should
defer to state decisions as long as there is a fair or substantial basis for
the application of state law in light of the circumstances of the case.

---

[19]Alternatively, and absent a specific objection, the rule is satisfied if
the court expressly rules on the issue—a circumstance not present in this
case.  *See Garvey*, 485 F.3d at 717.

*Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999).  The issue is whether the application of the rule is firmly established and regularly followed in the circumstances of the case.  *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003).  In *Cotto*, the Second Circuit cited three factors pertinent to the adequacy assessment: (1) whether the procedural violation was actually relied on by the trial court, and whether compliance would have changed its decision; (2) whether state decisions required compliance; and (3) whether the petitioner had substantially complied with the rule.  *See id.* Here, putting aside the first factor, it is clear that Wright did not comply with the third element.  *See Garvey*, 485 F.3d at 719.  And, as already stated, New York requires a contemporaneous objection when raising constitutional issues, and there are no unique circumstances in this case that would excuse compliance.  *See id.*  Therefore, given the present circumstances, the *Cotto* factors are satisfied and the State's rule served as an adequate basis for the appellate court's conclusion that Wright procedurally defaulted.

Of course, the ultimate question remains as to whether the decision actually relied on procedural default; that is, independent state law

54

grounds.[20]  As the Second Circuit has stated, reviewing courts must distinguish between state court decisions that fairly appear to rest on federal law or are interwoven with federal law, and those that appear to rest on state procedural law.  *See Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006).  Absent a clear and express statement relying on a state procedural bar, the Supreme Court's *Harris* presumption applies and decisions are deemed to rest on federal law.  *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 739-40 (1991), and referring to *Harris v. Reed*, 489 U.S. 255 (1989)).  However, the presumption may be overcome when there is reason to think there is a more likely explanation for the state court decision.  *See Richter*, 131 S.Ct. at 785.  In the second category, federal review is precluded.[21]

In resolving this issue, the court notes that even if Judge Bianchini's interpretation of the appellate decision is correct, the contemporaneous objection rule applies regardless of whether the independent state law

---

[20]Judge Bianchini found that it did.

[21]Unless, of course, the state procedural bar is inadequate to support the judgment, or unless the petitioner shows both cause and prejudice or a fundamental miscarriage of justice.  *See Jimenez*, 458 F.3d at 138.

ground was substantive or procedural.  *Garvey*, 485 F.3d at 713.  Thus, a fair reading of the first paragraph in the appellate decision—which states that Wright "failed to preserve for our review," *Wright*, 269 A.D.2d at 831—and its reference to *People v. Steward*, 256 A.D.2d 1147, 1148 (4th Dep't 1998), suggests reliance on independent state grounds.  *Steward* relied on the preservation rule to deny appellate review of a trial ruling precluding declaration against penal interest hearsay testimony.  *See* 256 A.D.2d at 1148.  While *Steward*'s underlying rationale for actually finding evidentiary default is unclear, *see id.* at 1148, the rationale in Wright's case was clear as the decision's next sentence revealed: "In any event, defendant failed to demonstrate that the declarant was unavailable as a witness."  *Wright*, 269 A.D.2d at 831.  Thus, Wright defaulted by failing to meet the criteria for the admissibility of the hearsay testimony.  On the other hand, if this court's alternative interpretation of the decision is correct and the operative due process ruling is in the second paragraph, the appellate court clearly found that Wright defaulted by failing to make any objection on due process grounds.  Under either interpretation, the court concludes that the appellate opinion rests on state default for failure to satisfy the contemporaneous objection or preservation rule.

Because Judge Bianchini concluded that Wright's claim was not procedurally barred—albeit on the alternative basis of inadequacy—and addressed the merits, he did not consider the cause and prejudice or fundamental miscarriage of justice exceptions.  While this court concludes that Wright's claim is procedurally barred, it has already recognized that the question of procedural default presents a closer issue.  Accordingly, it turns to a brief analysis of the exceptions.

Federal review of procedurally barred claims is permitted if the petitioner can show either: (1) cause for the default and actual prejudice; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  To demonstrate cause, the petitioner must show some objective factor external to the defense explaining why the claim was not previously raised.  *See Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999).  The petitioner can invoke the fundamental miscarriage of justice exception only if he can show actual innocence.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Wright cannot demonstrate cause for his default since the failure to comply with New York's evidentiary predicate was no more than a tactical decision by trial counsel designed to avoid the risk of testimony from

Jamie Thompson, which he obviously did not want the jury to hear.  So too, he has offered no explanation for his failure to apprize the trial court of his constitutional claim.  Accordingly, while the court need not consider prejudice, it has nonetheless already concluded that the *Chambers* due process issue is without merit, especially since the evidentiary ruling was correct under either New York or federal law.  And, Wright has offered no new evidence suggesting he is actually innocent.

In the final analysis, the court fundamentally disagrees with the magistrate judge's assessment that Wright was denied a fair trial, principally because he appears to have selectively cited the record to support that conclusion.  This court's de novo review of that same record, which has been exhaustively detailed above, does not support the same conclusion.

Beginning with opening statements and ending with a specifically tailored identity charge, the identity of the shooter was squarely placed before the jury.  On the one hand, the jury was presented with the independent and uncontested eyewitness testimony of Mowery, who knew Wright well; the uncontradicted and consistent eyewitness testimony of Ingrassia; the eyewitness testimony of participant Alex Thompson, who

58

identified Wright as the shooter and corroborated details of the Mowery, Ingrassia, Raspante, and Donatello testimony; and three post-arrest, jailhouse Wright statements circumstantially identifying him as the shooter. On the other hand, Wright successfully offered the jury his former attorney's testimony that Alex Thompson identified Jamie Thompson as the shooter; Reed's testimony that Ingrassia identified Jamie Thompson as the shooter; inconsistencies in the testimony of Raspante and Donatello about the black knit hat, and Donatello's initial identification of Jamie Thompson as the shooter; and testimony regarding the initial murder charge lodged against Jamie Thompson.  Confronted with these competing facts, the jury evaluated the evidence, resolved issues of credibility, held the prosecution to its burden of proof, and rendered its verdict, finding that Wright murdered Crouse, attempted to murder Ingrassia, and possessed a loaded handgun.

Against this backdrop, and with the benefit of hindsight—a perspective from which most people are smarter—it is difficult to assess what impact, if any, the proffered testimony of McClain and Leggett would have had on the jury's evaluation of the conflicting evidence just recited. The record is clear, however, that Wright made that choice because he

refrained from calling Jamie Thompson as a witness to establish that he was, or was not, available.  The record is just as clear that he understood the requirement, and made a tactical decision to avoid the risk that Thompson would testify, negate the McClain/Leggett jailhouse confession, and point the finger at him.  The record is also crystal clear that Wright never raised any due process constitutional concern with the trial court; nor is there any doubt that the trial court did not see any such issue of its own accord.

Mindful of the Supreme Court's *Richter* admonitions, *Richter*, 131 S.Ct. at 786-87, there was no unreasonable application of *Chambers* by the state court, and Wright procedurally defaulted in any event.

## B.    Respondent's New Arguments

In Judge Bianchini's second R&R, he recommended that the court refuse to consider respondent's new argument or, alternatively, consider the new argument and reject it on the basis of the conclusions reached in the first R&R.  (*See* 2d R&R at 6, Dkt. No. 31.)  Once again, respondent objected to Judge Bianchini's conclusions and offered a tempered, "*mea culpa*" rationale for having failed to respond to the merits of the due process argument in his initial submission. (*See* Objections, Dkt. No. 34.)

As to the due process argument, the court has elected to conduct a de novo review which requires, inter alia, an examination of the entire record and an independent assessment of the magistrate's factual and legal conclusions. Thus, in the context of this case, the court must assess the dual underpinnings of Judge Bianchini's conclusions— procedural bar and the merits of the due process claim. While the court agrees with Judge Bianchini's observation that by doing so, a district court may breed disrespect for magistrate judges, the court is nonetheless confident that it has consistently and firmly stated its strong support for magistrate judges. *See, e.g.*, *Carmona v. Wright*, 233 F.R.D. 270, 276-77 (N.D.N.Y. 2006).[22]

Accordingly, the court rejects the recommendation that it refuse to consider respondent's new arguments raised for the first time in its response.

## C.   <u>Wright's Non-Due Process Claims</u>

As Judge Bianchini observed in his first report, Wright argued that he was entitled to habeas relief because he was denied a fair trial as a result of seven errors in the proceedings below: (1) the trial court

---

[22]While the court has rejected Judge Bianchini's conclusion, respondent should not interpret that rejection as any indication that it disagrees with Judge Bianchini's underlying observations—it does not.

precluded him from calling exculpatory witnesses; (2) the prosecution engaged in misconduct in its opening statement and summation; (3) the trial court erroneously interjected itself into the questioning of witnesses; (4) the trial court erroneously admitted hearsay evidence designed to impugn the defense; (5) the trial court erroneously admitted hearsay portions of an autopsy report; (6) the verdict was against the weight of the evidence; and (7) he was denied the effective assistance of counsel.  (*See* 1st R&R at 7-8, Dkt. No. 26.)  As to all claims except the first, Judge Bianchini found that they were either procedurally barred, non-cognizable on habeas review, without merit, or harmless.  (*See id.* at 24, 26-27, 30, 34, 36, 38.)  Although Wright procedurally defaulted when he failed to object, the court has nonetheless reviewed Judge Bianchini's conclusions regarding the last six issues for clear error.  Finding none, the court adopts those conclusions without further comment.

**D.    Certificate of Appealability**

As relevant, 28 U.S.C. § 2253(c)(1)(A) provides: "Unless a ... judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from -- (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a

State court ...."[23]  In turn, a certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2).

For the reasons stated in this opinion, the court will grant a certificate of appealability as to Wright's due process claim.  However, petitioner has failed to make the requisite showing on all other claims, and the court declines to issue a certificate of appealability regarding those claims.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Bianchini's July 31, 2007 and April 15, 2008 Reports and Recommendations (Dkt. Nos. 26, 31) are

**REJECTED** insofar as (1) the court declines to disregard respondent's new arguments; (2) the court declines to conditionally grant petitioner Deshard Wright's amended habeas corpus petition (Dkt. No. 6) on the basis of his due process claim; and (3) the due process claim is

---

[23]Federal Appellate Rule 22 also provides that an appeal may not proceed unless a circuit justice or circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c).  *See* FED. R. APP. P. 22(b).

**REJECTED**; and it is further

**ORDERED** that Magistrate Judge Bianchini's July 31, 2007 and April 15, 2008 Reports and Recommendations (Dkt. Nos. 26, 31) are **ADOPTED** insofar as all of the remaining claims set forth in Wright's amended habeas corpus petition (Dkt. No. 6) are **REJECTED**; and it is further

**ORDERED** that Wright's amended habeas corpus petition (Dkt. No. 6) is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that a certificate of appealability limited to Wright's due process claim is **GRANTED**, but is otherwise **DENIED**; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**.

March 28, 2011
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
U.S. District Judge

64